United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANAREGHINA WONG LAI,

Plaintiff,

v.

NORTHWESTERN MUTUAL, *et al.*,

Defendants.
____________________________________/

No. C 13-5183 SI

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION TO STRIKE**

On August 22, 2014, the Court held a hearing on defendants' motion for summary judgment. For the reasons set forth below, the Court defendant's motion is GRANTED in part and DENIED in part.

## INTRODUCTION

On February 28, 2013, plaintiff AnaReghina Wong Lai filed this lawsuit against defendants Northwestern Mutual and The Northwestern Mutual Life Insurance Company (collectively, "NML"), as well as several defendants who have since been dismissed from this case. The complaint challenges defendants' decision to terminate benefits previously granted to plaintiff under a long-term disability insurance contract. Plaintiff claimed that she could no longer perform her job as a dentist after she fell and hit her head on two occasions in February 2004. Defendants began paying plaintiff benefits in December 2004, and then terminated those benefits in November 2011 after numerous doctors concluded that plaintiff was not disabled, and instead that she was malingering.

Plaintiff alleges that she is totally disabled as a result of anxiety and depression, and that her anxiety and depression may or may not be causally connected to the falls she sustained in 2004. Plaintiff contends that defendants conducted a biased investigation of her claim and that she is not malingering. The complaint alleges claims for breach of contract, intentional/fraudulent and negligent misrepresentation, breach of the covenant of good faith and fair dealing/insurance bad faith, and intentional infliction of emotional distress. Plaintiff seeks policy benefits, as well as general, consequential, and punitive damages, and attorneys' fees.

## BACKGROUND

### I. Factual background

#### A. The policy

Northwestern Mutual issued Disability Income Insurance Policy number D1196795 to plaintiff effective August 5, 1996 ("the Policy"). Hyde Decl. ¶ 2, Ex. 1.[1] The Policy contains the following provisions:

> **1.4 TOTAL DISABILITY**
> Until the end of the Initial Period, the Insured is totally disabled when unable to perform the principal duties of the regular occupation. After the Initial Period, the Insured is totally disabled when both unable to perform the principal duties of the regular occupation and not gainfully employed in any occupation.
> If the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the Insured may qualify as partially disabled.
>
> . . .
>
> **2.1 DISABILITIES COVERED BY THE POLICY**
> Benefits are provided for the Insured's total or partial disability only if:
> - the Insured becomes disabled while this policy is in force;
> - the Insured is under the Regular Care of a Licensed Physician during disability;
> - the disability results from an accident that occurs or a sickness that first appears while this policy is in force; . . .

[1] Plaintiff moves to strike the Hyde Declaration on the ground that it was submitted in bad faith because it is impeachable. Plaintiff asserts that Ms. Hyde cannot testify about the history of plaintiff's claim because she testified at her deposition that she had not read plaintiff's policy. The Court previously rejected this argument, *see* Docket No. 50, and for the reasons set forth in the prior order, finds no bad faith and thus DENIES the request to strike the Hyde Declaration.

> **5.1 CLAIM FOR POLICY BENEFITS**
> . . .
>
> **Proof of Loss.** For a claim to be payable, the Company must be provided with satisfactory written proof of loss. This is information that the Company deems necessary to determine whether benefits are payable, and if so, the amount of the benefits. The proof of loss will include information about the Insured's health, occupational duties, income . . . .

Hyde Decl. Ex. 1 at 5, 6, 10. Plaintiff's monthly benefit under the policy is $3,558. *Id*. at 3.

**B. Plaintiff's accident and request for disability benefits**

On September 28, 2004, plaintiff submitted a Request for Disability Benefits to NML claiming that she was totally disabled from working as a dentist. Hyde Decl. Ex. 2. The Request for Disability Benefits stated that plaintiff became disabled as a result of slipping and falling on a wet floor at work on February 12, 2004. *Id*. Plaintiff also stated that at the time of the accident, she had been working 10 hours per day, 3.5 days per week as a dentist at Kokua Kalihi Valley (KKV) Family Services in Honolulu, Hawaii. Plaintiff listed her duties as: 30% general dentistry; 10% crowns and bridges; 30% office oral surgery; and 30% other (root canals, gum therapy, gum surgery). *Id*. Physiatrist John Edwards completed an Attending Physician Statement stating plaintiff was disabled based on "cognitive and emotional dysfunction." *Id*. Ex. 3.

Plaintiff also claims that she fell at home on February 21, 2004. Pl's Ex. 14. Plaintiff received treatment at Queens Medical Center in Hawaii after her second fall. Plaintiff's doctors ordered a CT scan on February 23, 2004 and an MRI of plaintiff's brain on February 27, 2004. Both of these test results were normal. *Id*. Ex. 8. Neurologist James Pierce, MD, examined plaintiff on February 26, 2004, and opined that plaintiff was distressed but "cranial nerves, motor, sensory, cerebellar systems, and reflexes were otherwise normal." *Id*. Ex. 6.

**C. Treatment**

After her accident, plaintiff filed a Workers' Compensation ("WC") claim in Hawaii. In April 2004, her WC carrier sent her to Centre for Neuro Skills ("CNS"), a rehabilitation clinic in California, for treatment. Plaintiff was treated at CNS from April to October 2004. Hyde Decl. ¶ 12. Dr. Richard Helvie provided neurological treatment. In a report dated May 6, 2004, Dr. Helvie stated that plaintiff

"has had again, recurrent mild traumatic brain injury. She has had a significant post-traumatic head syndrome which at this time, leaves her temporarily, totally disabled. Her symptomatology is well beyond what I would anticipate for her injury, plus her conditions appears to have progressed, which would indicate to me that there [are] significant functional factors playing a role." *Id*. Ex. 9. Dr. Helvie recommended neuropsychological testing. *Id*. In a report dated June 3, 2004, Dr. Helvie wrote,

> I did briefly talk to Dr. Hall about the neuropsychological evaluation which shows definite evidence of symptom magnification.[2] This would concur with my clinical impression as there is a marked discrepancy between the type of injury and the current symptoms and also there are some inconsistencies in findings. This will need to be aggressively addressed in counseling and therapies. The patient does, however, have some true vestibular problems as well as some probable secondary problems with vision.

*Id*. Dr. Helvie recommended counseling. *Id*. In a report dated September 16, 2004, Dr. Helvie wrote,

> [Plaintiff] has now been in the program four and one-half months. She has a persistent, post-concussion syndrome. Our evaluations have some mild organic component, that being in the visual and vestibular areas. Otherwise, her issues appear to be more reactive or psychological. She was improving for the first month or two, but over the last one or two months, she has regressed. It is my opinion this means that the problems are now more psychological and not mainly organic. The MRI of the brain was reread as normal.
>
> She presents a very complex clinical picture. I do not feel that any further medications will significantly alter her current clinical situation.
>
> It would be my recommendation to continue to push through these issues through counseling and hopefully she can be motivated and gain insight into her disability that will eventually lead to her returning to a productive life. At this point, I see no financial gain for her in not returning to work.

*Id*.

In a letter dated October 11, 2004, Disability Benefits Specialist Robin Lucas of NML informed plaintiff that her claim for disability benefits had been received and assigned to Lucas for evaluation. Hyde Decl. Ex. 4. The letter informed plaintiff that a representative of NML would be contacting her to schedule an interview, and that NML was in the process of obtaining plaintiff's medical records in order to evaluate her claim. *Id*.

On October 26, 2004, NML field representative David Thorpe met with plaintiff's case manager at CNS, Zenobia Mehta, followed by a meeting with plaintiff. Thorpe prepared a written report regarding those meetings, and noted the following:

---

[2] Defendant states that CNS did not produce Dr. Hall's neuropsychological evaluation.

> **INPATIENT TREATMENT - 6 MONTHS**
>
> Ms. Mehta advised that Dr. Wong Lai has been treating as an inpatient at their facility for approximately six months. She did not have the exact date of admission, as they were in the medical records which were not available to her during our meeting. She explained that the inpatient care consisted of treatment Monday through Friday, from 9:00 a.m. to 4:00 p.m. The treatment included physical therapy, occupational therapy, speech therapy, counseling, and orthopedic treatment.
>
> **ORTHOPEDIC PROBLEMS RESOLVED EXCEPT FOR DEQUERVAIN'S**
>
> Ms. Meha advised that the Insured does not have any orthopedic problems at this time. She noted that her right shoulder symptoms that occurred during her slip and fall accident in February 2004 have essentially resolved. She noted that the Insured is wearing bilateral wrist braces, but they are encouraging her not to wear them. She noted that the Insured insists on wearing bilateral wrist braces, although the Centre physicians are not certain if they are needed. Her wrist diagnosis is DeQuervain's disease although they have not done any upper extremity testing date.
>
> **POSSIBLE SYMPTOM MAGNIFICATION**
>
> Ms. Mehta advised that it has been difficult for them to determine the Insured's actual symptoms. She noted it has been documented in their medical records that there is possibly some symptom magnification. She gave for an example, that while under observation, the Insured will walk with a very stiff and uneasy gait, appearing to have difficulty with balance. While not under observation, the Insured has been observed to walk in a normal manner. The symptom magnification has been a concern of the staff for several months. . . .
>
> . . .
>
> **NORMAL BRAIN MRI**
>
> She advised the Insured had a normal brain MRI scan. She noted that the Insured continues to present herself with problems with words, word finding, and other.

*Id*., Ex. 5 at 2-3. With regard to Thorpe's meeting with plaintiff, he reported that she appeared "uneasy on her feet," "presented herself in a very emotional and tearful manner," "had difficulty following questions I asked her," and "appeared confused at times." *Id*. at 5. She requested that her attorney or agent be contacted for more information.

In a letter dated December 10, 2004, NML approved plaintiff's claim on an "accommodation basis" while its review continued. *Id*. Ex. 11. The letter stated that "[t]his accommodation payment should not be construed as a waiver of any rights that Northwestern Mutual may have, nor is it an admission of liability under this policy." *Id.*

Soon thereafter, plaintiff began treatment at UCSF. *Id.* ¶16. According to the Hyde Declaration, NML obtained plaintiff's medical records from UCSF, including notes from neurologist Dr. Chen. *Id*.

Hyde states in her declaration that "[o]n April 13, 2005, NML's claim adjustor Robin Lucas discussed the claim with neuropsychologist consultant Sara Swanson, Ph.D., . . . [and] that Dr. Swanson recommended neuropsychological testing." *Id.* ¶17.

NML arranged an independent medical exam ("IME") with Dr. William McMullen, a board certified neuropsychologist. *Id.* ¶ 18. Dr. McMullen conducted neuropsychological testing on plaintiff on June 18, 2005 and July 8, 2005. *Id.* Ex. 12. Dr. McMullen stated in his report,

> Dr. Wong [Lai] appeared to be engaged in an attempt to slow down or obstruct the interview and testing process throughout both sessions. After completing the intellectual testing in over two hours (normal time is 60-90 minutes) she complained that she was unable to continue due to fatigue. This was at approximately 3:15 PM. On the second testing session, Dr. Wong [Lai] began by attempting to go over interview issues that had been covered in the previous session. When this was not allowed it took approximately 10 minutes to get her started on the PAI [test]. She was ultimately started on the Personality Assessment Inventory, a 344 - item self-report inventory that normally takes brain injured individuals approximately 90 minutes to complete and completed the inventory in three hours. She then went on the complete the balance of neuropsychological testing in 2 additional hours.

*Id*. Ex. 12 at 23.

Dr. McMullen reported that plaintiff's results indicated "very poor effort" and "extreme exaggeration or response bias." *Id*. at Ex. 12 at 23-24. On the "CARB," a computerized measure of motivation, plaintiff's performance resulted in an automated interpretation of "very poor effort," and "[t]his effort was very far below that expected from either normal controls or persons with verified brain damage. It is extremely unlikely that even an individual who has sustained a severe brain injury would perform this poorly in the absence of symptom exaggeration or malingering issues." *Id*. at 23. On another computerized measure of motivation (the "WMT"), the automated interpretation of plaintiff's performance stated, "Three separate measures on the WMT which are sensitive to response bias are below the normal range and provide strong evidence of systematic response bias. This individual has responded in a fashion which is consistent with the pattern obtained by individuals attempting to simulate cognitive deficits." *Id*. at 24.

Dr. McMullen also administered the Test of Memory Malingering ("TOMM"), A measure of motivation administered in face-to-face testing. Dr. McMullen opined that plaintiff's performance was "well below that of normal controls and well below the performance nearly always obtained by individuals with verified brain injury who are well motivated. Although individuals with severe

dementia occasionally score in this range, virtually no one with verified brain injury performs this poorly." *Id*. Dr. McMullen noted that "numerous lines of evidence provide strong support for a diagnosis of malingering of cognitive symptoms." *Id*. at 36. Dr. McMullen concluded that while some level of anxiety or depression may exist, "[i]n the case of the cognitive symptoms this possibility can be excluded because the injury characteristics were so trivial and the other clinical findings were negative - and so no cognitive impairment would be expected. However in the case of psychological symptoms it remains possible that some level of depression or anxiety may exist." *Id*. at 37.

Northwestern submitted Dr. McMullen's report to neuropsychologist consultant Dr. Swanson. Hyde Decl. ¶ 19. In a September 7, 2005 report, Dr. Swanson reviewed plaintiff's medical history, as well as June 2005 surveillance that showed plaintiff walking with a normal gait (as opposed to the impaired gait observed during medical treatment). *Id*. Ex. 13. Dr. Swanson opined that she agreed with Dr. McMullen's conclusions:

> I agree with the conclusions of Dr. McMullen. There is no evidence of any head trauma of any severity. The previous medical treatment with intensive inpatient rehabilitation for head trauma even when the treating physicians recognized that the symptoms were "functional" or represented a conversion disorder is unfortunate. The appropriate treatment at that time was psychiatric treatment and non-reinforcement of illness behavior. The only area of concern in this case is whether there is some underlying psychiatric disorder since leaving one's home and practice to spend months in inpatient rehabilitation may be seen as something of an extreme measure for malingering. The reported "convulsion" sounded like a non-epileptic event that may also be consistent with a conversion symptom. However, the personality testing did not support a somatoform or conversion disorder. It is likely that the family dynamics and dependency issues contributed to the behavioral presentation at that malingering is the primary diagnosis. There appeared to be no occupational limitations from a cognitive perspective.

*Id*. at NM002606.

NML then scheduled a psychiatric examination of plaintiff with Board Certified Psychiatrist Douglas Tucker, MD. Hyde Decl. ¶20, Ex. 14. Dr. Tucker interviewed plaintiff on January 1, 2006 and March 23, 2006, reviewed plaintiff's medical records, and interviewed plaintiff's psychiatrist and treating internist. In a report dated March 27, 2006, Dr. Tucker summarized his opinion that "Overall, there is substantial evidence in this case of exaggeration and/or fabrication of symptoms, which indicates diagnoses of Malingering and/or Factitious Disorder. It is possible, that some symptoms are also being produced unconsciously, or as a result of superimposed depression and anxiety. It is extremely unlikely that traumatic brain injury is responsible for any of Dr. Wong-Lai's current

symptoms." *Id*. Ex. 14 at 2.

> The most parsimonious diagnosis in this case, consistent with the available evidence, is Factitious Disorder with Physical and Psychological Symptoms. This means that Dr. Wong-Lai is consciously producing symptoms for the purpose of primary gain, including the patient role with its various associated benefits (and costs), caretaking by family members, and dependent role vis-a-vis her parents. It is possible that at times she is malingering, or consciously producing symptoms for the purpose of secondary gain such as disability insurance payments and avoidance of work. This seems less likely, though, given the proportionally greater secondary losses (both financial and professional) that she has sustained. It is also possible that some of her symptoms have been produced unconsciously (rather than consciously) for the purpose of primary gain, and would thus be considered somatoform or conversion symptoms. Finally, it is possible that some of her symptoms are related to anxiety and depression, since these are well-known to cause problems with sleep, energy, pain, decreased memory, impaired concentration, sweating, tremor and palpitations.

*Id*. at 3. Dr. Tucker also reported that Dr. Terplan, plaintiff's treating internist, indicated he found no objective evidence to support any physical damage to plaintiff's brain. *Id*. at 16. Dr. Eisendrath, an Attending Physician at UCSF's Langley Porter Psychiatric Clinic, "indicated that he suspected symptom amplification (exaggeration) in this case, with apparent cognitive deficits related to psychological factors (depression, primary gain, secondary gain) rather than actual brain damage … because the alleged injury itself seemed minor, and her reported symptoms were unusual and out of proportion to the injury." *Id*.

Northwestern sent Dr. Tucker's report to Dr. Terplan and her treating neurologist, Dr. Chen. In a letter dated October 20, 2006, Dr. Terplan informed Robin Lucas of NML that he agreed with Dr. Tucker's diagnosis of factitious disorder. *Id*. Ex. 22.

**D. Workers' Compensation IMEs**

Plaintiff was pursuing a workers' compensation (WC) claim at the same time as her claim with NML. NML obtained the workers' compensation IMEs. Hyde Decl. ¶ 22. Plaintiff was examined by orthopedic specialist Jack Moshein, MD on September 3, 2004, who opined that plaintiff was not disabled from working based on any orthopedic condition. Hyde Decl. Ex. 16. Plaintiff was also examined by occupational medicine specialist Leonard Cupo, MD, who opined there were no objective findings to support a neurologic condition and that "[t]here is no medical reason that the employee cannot resume full duty as a dentist from a musculoskeletal or neurological point of view." *Id*. Ex. 17.

WC set up psychiatric IMEs for plaintiff in 2006. Hyde Decl. ¶ 23. On April 8, 2006, plaintiff

was evaluated by Mark Stitham, MD, Board Certified in Psychiatry and Neurology. Dr. Stitham reviewed plaintiff's medical records as well as IME reports from a number of doctors. Dr. Stitham also administered psychological testing that was interpreted by Joseph Rogers, Ph.D. Dr. Stitham concluded that "[i]n reasonable medical probability, the history, presentation, records, and testing all clearly indicate a diagnosis most consistent with malingering." Hyde Decl. Ex. 18 at 18. Dr. Stitham also stated that "[e]tiology of malingering is, of course, volitional. Etiology of personality traits are non-industrial, pre-existing, and due to an interaction of genetic and early environmental factors." *Id.* at 19.

In interpreting the neuropsychological test results, Dr. Rogers stated,

> In summary, there was extreme and blatant symptom magnification on the MMPI-2 that rendered those results invalid. . . . However, on the MCMI-II, she responded more appropriately without significant symptom magnification or excessive defensiveness. This vast difference in response patterns can be explained on the basis of two different scoring strategies between these two instruments. The MMPI-2 is scored with a technique called "empirical criterion keying," which scores the individual's response on the positive direction based solely on each item's statistical power to match the responses of the standardized sample of patients with the emotional symptom or personality train that is being measured. In other words, this scoring method does not depend on the content of the item. Because of this, the person taking the MMPI-2 cannot fake or control their responses based on the contend of the test items. On the other hand, the MCMI-II uses a content-based scoring methodology. That is, the content of each item actually determines what scale is being measured. As such, an individual can more easily control their responses based on item content on the MCMI-II. This would be especially easy with more sophisticated claimants, such as Ms. Wong-Lai. What we can conclude from all of this, is that she engaged in clear and blatant symptom magnification consistent with malingering on the test with the scoring system that is harder to manipulate, but saw through the items on the MCMI-II and was able to control her responding without obviously embellishing her symptoms. The most salient personality traits that emerge included: dependent, histrionic, and passive-aggressive.

Hyde Decl. Ex. 19 at 2-3.

**E. NML approves the claim**

NML submitted Dr. Tucker's IME report to an in-house medical consultant, Michael Logan, MD, a Board Certified psychiatrist. Hyde Decl. ¶ 24, Ex. 20. Dr. Logan opined that the diagnosis of postconcussion syndrome was not supported by the clinical evidence, and recommended asking Dr. Swanson to review plaintiff's claim again in light of Dr. Tucker's IME. *Id.* Dr. Swanson then reviewed Dr. Tucker's report, and in an April 26, 2006 report opined that plaintiff's condition ranges from malingering to factitious disorder, which are both consciously produced, and that "consciously produced

symptoms and personality disorders are not considered limiting, but at this point the insured will likely need time to obtain appropriate psychiatric treatment . . . including a behavioral treatment program in which she works toward gradual return to work and increased independence while reducing reinforcement for illness behavior." *Id.*

In a letter dated June 8, 2006, Robin Lucas of NML notified plaintiff that "following a comprehensive review of Dr. Wong Lai's claim file including all medical evidence received to date I am pleased to inform you that I have reached a determination that Dr. Wong Lai's claim will be decided in her favor. Therefore, all previous accommodation payments should now be construed as regular benefit payments. The insured's claim will be administered as one of total disability at this time." *Id.* Ex. 21. Lucas's letter noted that Dr. Tucker had diagnosed plaintiff with "Factitious Disorder with Combined Psychological and Physical Signs and Symptoms Combined with Major Depressive Disorder, single episode, moderate." *Id.* Lucas's letter stated that "[t]his case is very complex" and "[i]t is our opinion the Insured should obtain appropriate psychiatric treatment (pharmacotherapy, cognitive behavior treatment) including a behavioral treatment program in which she works toward gradual return to work and increased independence while reducing reinforcement of illness behavior." *Id.* Lucas also informed plaintiff that "our Insureds have an implied obligation to participate in a treatment program which may lead to an improved level of functioning. We would like the Insured to keep us informed of her arrangements for this treatment via her Request for Continuance of Disability Benefits form." *Id.*

**F.    2007-2011**

NML sent Dr. Tucker's report to plaintiff's treating internist, Dr. Terplan, and her treating neurologist, Dr. Chen. Hyde Decl. ¶ 26. In February 2007, Disability Benefits Specialist Michael McDevitt began administering plaintiff's claim. *Id.* ¶ 27. On April 9, 2007, McDevitt provided copies of the IME reports of Drs. McMullen and Tucker to plaintiff's treating psychologist, Dr. Armas, and treating psychiatrist, Dr. Brooks, for their use in evaluating and treating plaintiff. *Id.* ¶ 27, Ex. 23.

Beginning in 2007, NML requested quarterly proof of loss from plaintiff while she was undergoing psychiatric treatment at UCSF. Hyde Decl. ¶ 28. Plaintiff submitted three Attending

Physician Statements ("APS") in 2007 and 2008, two forms in 2009, and one form each in 2010 and 2011. *Id.* Plaintiff's doctors certified her disability based on Major Depressive Disorder and Anxiety, and no doctor certified her for any physical condition. The doctors noted that prior neurological workups indicated that there was no known physiological condition that explained her symptoms. Plaintiff's neurologist at UCSF ordered an MRI of plaintiff's brain on February 2, 2007, and those results were normal. *Id.* ¶ 28, Ex. 26.

In June 2008, Disability Benefits Specialist Debbie Champeau assumed administration of plaintiff's claim. Hyde Decl. ¶ 29. Champeau periodically requested plaintiff's updated medical records from Langley Porter and plaintiff's other treatment facilities. *Id.* An APS dated April 8, 2009, submitted by plaintiff's treating psychiatrist at Langley Porter, Anna Ordonez, MD, stated that plaintiff's "depression symptoms are gradually improving" and that plaintiff is "currently being referred for new neuropsychological testing and neuro eval." *Id.* Ex. 27. Plaintiff did not go through with the testing and evaluation. *Id.* ¶ 29.

On August 25, 2009, Champeau submitted a psychiatric claim referral requesting a comprehensive review of the claim in light of Dr. Ordonez's April 8, 2009 APS form. Hyde Decl. Ex. 28. The file was reviewed by Jennifer Cicero, MSW, LCSW, who provided a report summarizing the records. *Id.* Cicero concluded as follows:

> At this time, degree of any ongoing limitations is not clear. In order to understand the Insured's current level of functioning we will need additional information. I would recommend moving forward with the following:
>
> - Consider monitoring the Insured's activities
> - Obtain a COD [field interview] to talk with the Insured about her ongoing treatment, symptoms, activities and future plans
> - After we have monitored her activities and obtained a COD, move forward with updated neuropsych testing along with a psychiatric evaluation (EMEs)
>
> I have discussed the file with Dr. Swanson, and she agrees with the above recommendations. Please refer the file back to Dr. Swanson and Dr. Logan after we have obtained the additional information.

*Id.*

On February 11, 2010, Champeau submitted a disability claim referral to her team lead Karen Deeds, for the purpose of conducting an annual review of the claim. Hyde Decl. ¶ 33, Ex. 33. Champeau summarized the claim administration as follows:

> Initially the insured claimed cognitive difficulties after a slip and fall at work, and then another fall at home. The level of her cognitive complaints remain unexplained.
>
> Since the last annual referral this insured has remained totally disabled. The insured continues to claim depression, anxiety, marked cognitive impairment, poor memory, concentration and sequencing. Throughout this claim the insured's gait also appears to be affected, on and off. However, it is also noted that the insured became married in 2009.
>
> Medical records from Dr. Armas indicate the insured misses several appointments. But since we are only provided with a tx [treatment] summary it is difficult to determine [with] what regularity the insured is actually seen. . . .
> . . .
>
> We have concerns whether total limitations continue. The insured's treatment providers have been recommending repeat neurological and neuropsychological evaluations. While the insured initially seemed agreeable to this, she has since changed her mind and is now declining this idea. She also declines any change in medications which her treatment providers feel would improve her claimed cognitive difficulties. Her treatment provider has suggested that the insured's husband come to the sessions, but the insured has declined this suggestion as well.

*Id*. Ex. 33.

Champeau noted that NML was in the process of obtaining surveillance on plaintiff and scheduling a field interview with plaintiff and her attorney, and that "[a]fter receipt of the surveillance and COD, the file will be reviewed to determine if repeat EMEs are appropriate to rule out a conversion disorder, factitious disorder, personality disorder or malingering." *Id.* On February 29, 2010, Ms. Deeds agreed with the recommendations. *Id.*

Northwestern Mutual scheduled an interview with plaintiff by Field Benefit Consultant Jeff Mallory. *Id*. Ex. 29. On March 16, 2010, Mallory interviewed plaintiff in the presence of her attorney and her husband. *Id*. Ex. 35. According to Mallory's report about the interview, the meeting lasted for over an hour with several breaks. Mallory noted in his report that at one point plaintiff "had a rather intense emotional response including raising her voice and sobbing uncontrollably," and that her concentration and focus and memory appeared reduced during the interview. *Id.*

Between June 2010 and April 2011, Champeau repeatedly wrote to plaintiff's counsel requesting updated APS and Continuance forms because those forms were overdue. *Id*., Ex. 37, 39, 41-42, 44-45. Champeau also informed counsel that NML would be arranging independent neuropsychological and psychiatric evaluations. *Id*. ¶37., Ex. 37. NML scheduled a neuropsychological exam for plaintiff on July 24, 2010, and a psychiatric examination on August 20, 2010. *Id*., Ex. 39. Plaintiff cancelled the

IME appointments because she was pregnant and was concerned about the stress of testing. *Id*., Ex. 40.

On February 1, 2011, Champeau wrote to plaintiff's counsel regarding the lack of response to previous letters and voice mail. Champeau explained in part:

> For all of 2010 we received one Continuance form from the Insured, one update from Dr. Munshi and one update from Dr. Armas. This information was received in June 2010. We do not know the extent of treatment the Insured received in 2010. We do not know the status of the Insured's symptoms and limitations from June 2010 to the present.

*Id*., Ex. 44. Champeau again requested the outstanding information and informed plaintiff that NML wanted to schedule a neuropsychological evaluation and psychiatric evaluation. *Id.*

On March 9, 2011, NML received an APS completed by Dr. Bitner, one of plaintiff's treating psychiatrists. *Id*., Ex. 46. Dr. Bitner diagnosed plaintiff with Major Depressive Episode, moderate and Anxiety, Not Otherwise Specified. She listed duties as "caring for infant daughter." Dr. Bitner noted that plaintiff had very severe memory and concentration issues and that she often appeared confused. Dr. Bitner noted that she had "not restricted" plaintiff from work, but that plaintiff was functionally limited in her ability to work as a dentist based on her "profound memory impairment." *Id.*

On April 25, 2011, Champeau wrote plaintiff's counsel stating that NML had been waiting for plaintiff's medical records since June 2010, as well as an updated Continuance of Disability Form. *Id*., Ex. 47. On May 2, 2011, plaintiff submitted the Continuance of Disability form as well as a signed authorization to obtain psychotherapy notes. *Id*., ¶ 46. NML requested updated records from Dr. Bitner and Dr. James-Myers, plaintiff's treating psychiatrists at Langley Porter. *Id*., ¶ 47.

NML scheduled neuropsychological testing with June Paltzer, PhD on September 7, 2011, and an examination with psychiatrist James Reich, MD on October 3, 2011. *Id.* Ex. 48. Dr. Paltzer is a board certified psychologist and neuropsychologist. She examined plaintiff on September 7, 2011. *Id*., Ex. 49. Dr. Paltzer administered a number of neuropsychological tests and concluded that plaintiff gave inadequate effort on many tests. Dr. Paltzer wrote in her report,

> The results of the current neuropsychological evaluation revealed impaired performance on virtually all of the measures administered. However, test findings ranged from questionable to clear invalidity. Dr. Wong put forth poor effort on multiple embedded and free-standing measures of effort. She performed at or below chance on a number of measures, consistent with severe motivational impairment. Current test results are overall consistent with Dr. McMullen's findings in 2005.
>
> Her report of forgetfulness of remote information is incompatible with the type of memory that is typically affected following the alleged injuries she had.

> Dr. Wong does not appear to meet the criteria of mild traumatic brain injury, given that available medical records did not document loss of consciousness/LOC. She does not meet the current DSM–IV–TR diagnostic criteria for post concussion syndrome, because results of neuropsychological testing did not support neuro-cognitive effects but rather amplification of cognitive symptoms. Her current claimed deficits are inconsistent with behavioral observations and with the characteristics of the reported "head injuries."
>
> While Dr. Wong appears to meet criteria for "anxiety disorder not otherwise specified/NOS," it is not possible to differentiate between pre–versus post-accident anxiety and depression due to her tendency to exaggerate symptoms.

*Id*., Ex. 49 at 19-20.

On September 21, 2011, NML submitted Dr. Paltzer's report to neuropsychology consultant Dr. Swanson. In her October 12, 2011 report, Dr. Swanson agreed with Dr. Paltzer's interpretation of the testing data, and concluded that "to a reasonable degree of neuropsychological certainty, there is no support for cognitive impairment and the injury parameters indicate that the head trauma, if any was insignificant." *Id*., Ex. 50. Dr. Swanson stated that plaintiff's "failures on effort testing are quite blatant, falling far below the cutting scores and below chance indicating that she knows the answer and is purposefully choosing the wrong answer (e.g., Test of Memory Malingering)." *Id.*

Board Certified psychiatrist James Reich examined plaintiff on October 3, 2011. Dr. Reich diagnosed plaintiff with factitious disorder with predominantly physical symptoms with the possibility also of an adjustment disorder with mixed anxious and depressed features secondary to the complications of having a factitious disorder. *Id*., Ex. 51 at 19. Dr. Reich stated that with factitious disorder,

> [A] patient claims symptoms that he or she does not have in order to function in the sick role in obtain the benefits of being in the sick role. This appears to fit Dr. Wong Lai's case best. Dr. Wong Lai has put a great deal of effort into learning her role, including attending classes for brain-damaged individuals three hours twice a week for years. She has, over time, mastered the external appearance of having brain disorder dysfunction she is trying to compensate for. Factitious disorders, when established, are difficult to treat. They tend to be long-lasting and they do not respond well to confrontation, psychotherapy or medications. Dr. Wong Lai's playing the role of the brain injured person may have created lifestyle constraints with secondary adjustment problems which might have been reflected, to some extent, in depressed and anxious mood at times (although not to the degree of emotional symptoms she claimed). This would be because it is harder to maintain friends and relationships and work on maintaining such a role.

*Id*. 20-21.

Dr. Reich opined that Dr. Wong Lai was likely not malingering because she appeared to maintain her "sick role" in a variety of contexts and surveillance had not indicated activities outside of that

**United States District Court**
For the Northern District of California

particular role. *Id.*, Ex. 51 at 20. Dr. Reich also contacted plaintiff's treating psychiatrist Dr. James-Myers to discuss his findings. Dr. Reich wrote, "Overall, Dr. James-Myers described Dr. Wong Lai as a patient who is not consistent with treatment, who didn't describe her symptoms accurately, but tended to have a very high level of exaggeration as far as she could tell, both in the area of her cognitive difficulties and her emotional difficulties." *Id.*, Ex. 51 at 28.

On October 17, 2011, NML submitted the reports of Dr. Reich, Dr. Paltzer and Dr. Swanson to its consulting psychiatrist Dr. Logan for review. In a report dated November 5, 2011, Dr. Logan stated that he agreed with Drs. Paltzer and Swanson that plaintiff was malingering (and disagreed with Dr. Reich's conclusion to the contrary). *Id.*, Ex. 52. Dr. Logan noted that plaintiff's "symptoms are manifested primarily when it is to her advantage to do so and seem to be absent when she believes she is not being observed or when she does not need to be sick," and he opined that plaintiff's feigned symptoms result from both secondary gain (disability benefits) and primary gain (assume the sick role). *Id* Dr. Logan also concluded that plaintiff does not meet the criteria for mild traumatic brain injury. *Id*.

**G. NML denies the claim**

On November 8, 2011, Champeau submitted a claim referral to team lead Karen Deeds recommending that the claim be terminated. Deeds approved the denial, noting "Dr. Swanson indicates after review of the recent EME that she finds no support for cognitive impairment and the Insured's refusal to complete the MMPI2 makes it difficult for us to determine if the reported emotional symptoms may have been embellished. Dr. Logan indicates that there is no evidence that the Insured sustained a significant head trauma and has given poor effort on testing. He states he finds no support for cognitive impairment due to a head injury." *Id.*, Ex. 53.

In a letter dated December 8, 2011, NML terminated plaintiff's disability benefits. NML discussed the history of plaintiff's claim as well as the evaluation reports from Dr. Paltzer and Dr. Reich. NML explained its claim decision as follows:

> Based on the information provided in the above noted reports along with the results of previous evaluations done during this claim and medical records received to date, it is the opinion of our psychiatric consultant that the insured does not have limitations from a psychiatric condition that rise to the level of severity that would prevent her from performing the duties of a Dentist. Consciously produced symptoms and

United States District Court
For the Northern District of California

> personality disorders are not considered limiting. Please note, any complications the insured may have due to the current status of her dental license or possible inability to obtain liability insurance is not considered a disability.

*Id*., Ex. 54.

NML included the reports of Drs. Paltzer and Reich for review. NML invited plaintiff to produce any additional information for consideration with 30 days. Neither plaintiff nor her attorney responded to this letter. *Id*. ¶ 56.

**H. Discovery in this case**

NML has submitted substantial evidence which it contends shows that plaintiff has been malingering, and that plaintiff was functioning at a much higher level than she had ever represented to anyone assessing her disability. This evidence includes plaintiff's wedding video from August 2007, in which she is seen dancing gracefully and giving toasts, as well as evidence that throughout the 2006-2011 time period, plaintiff managed real estate properties for her parents, engaged in various social activities, traveled with her husband, frequently shopped for leisure, and has been actively involved in the renovation of a home that she and her husband purchased.

NML has also submitted excerpts of the deposition transcripts of the two doctors who certified plaintiff's disability, Drs. Bitner and Armas. After both doctors were presented with evidence of plaintiff's functioning outside of the disability assessment context, they both testified that they would not have certified plaintiff as disabled because their certifications were based on the information plaintiff provided and they did not have a complete picture of plaintiff's true functioning.

**II. Procedural background**

On February 28, 2013, plaintiff filed this case against Northwestern Mutual in San Francisco Superior Court alleging breach of contract and bad faith for the termination of long-term benefits under a disability policy. Northwestern Mutual removed the action to this Court on November 6, 2013.

On February 26, 2014, this Court issued a Pretrial Preparation Order setting May 16, 2014 as the deadline to designate experts and produce expert reports, and June 20, 2014 as the deadline to disclose rebuttal expert witnesses and reports. Docket No. 21. The expert discovery cut-off was set for July 25, 2014. *Id*. The parties agreed to extend the expert discovery cut-off to accommodate vacation

schedules. Lariviere Decl. in Support of Motion to Exclude ¶ 3.

On the May 16, 2014 deadline, Northwestern Mutual served its expert disclosure and produced expert reports prepared by Drs. Michael Logan, Sara Swanson and James Reich. Plaintiff served her expert disclosure by the May 16, 2014 deadline, disclosing Dr. Martin Williams as an expert in forensic psychology. *Id*. Ex.3. Plaintiff did not timely produce Dr. Williams' expert report, but produced that report, which was dated May 12, 2014, on or about May 23, 2014. *Id*. ¶ 4. Dr. Williams' report states that he was instructed to prepare his initial report based solely on his interview with plaintiff. *Id*. Ex. 5 at 2.

On June 20, 2014, Northwestern Mutual served its rebuttal expert disclosures and rebuttal expert reports prepared by Drs. Logan, Swanson and Reich. *Id*. ¶ 5. The rebuttal reports responded to the opinions and conclusions reached by Dr. Williams in his May 12, 2014 report. Plaintiff did not serve any rebuttal disclosure or expert report by June 20, 2014. *Id*. On May 23, 2104, Northwestern Mutual filed the instant motion for summary judgment.

Plaintiff filed her opposition to Northwestern Mutual's summary judgment motion on July 25, 2014. Attached as "Exhibit 13" to the Declaration of Leslie Leone in Support of Plaintiff's Opposition is a supplemental report by Dr. Williams dated July 16, 2014. The July 16, 2014 report had not been previously disclosed to Northwestern Mutual. *Id*. ¶ 7. Plaintiff characterizes this report as a supplemental report, while defendant characterizes the report as an untimely rebuttal report that should be excluded pursuant to Federal Rule of Civil Procedure 37.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out

'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

**DISCUSSION**

**I. Defendant's motion to exclude Dr. Williams' July 16, 2014 expert report**

Defendant has moved to exclude the July 16, 2014 "supplemental" report of Dr. Martin Williams, which was filed as Exhibit 13 to the Declaration of Leslie Leone in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Defendant contends that Dr. Williams' July 16, 2014 report is an untimely rebuttal report which offers new opinions, and that the Court should not consider the report in ruling on defendant's motion for summary judgment.

Federal Rule of Civil Procedure 26(a)(2)(B) requires parties to disclose the identity of each expert witness "accompanied by a written report prepared and signed by the witness." Fed. R. Civ. Proc. 26(a)(2)(B). A rebuttal report shall be filed "within 30 days after the disclosure" of the evidence that the expert is assigned to rebut. Fed. R. Civ. P. 26(a)(2)(C). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The Court agrees with defendant that Dr. Williams' July 16, 2014 report is untimely. Dr.

United States District Court
For the Northern District of California

Williams' initial May 12, 2014 report stated opinions based solely upon Dr. Williams' interview of plaintiff. The deadline for producing expert rebuttal disclosures and reports was June 20, 2014. In the July 16, 2014 report, Dr. Williams primarily responds to the opinions rendered by defendants' experts Drs. Logan, Swanson and Reich in their initial expert reports, and he discusses new testing that he performed on plaintiff after the submission of his initial report. The July 16, 2014 report does not supplement the initial report, but instead rebuts the reports of the defense experts and provides new opinions. Accordingly, the Court GRANTS defendant's motion to strike the July 16, 2014 report as untimely for purposes of this motion.[3]

## II. Defendant's motion for summary judgment

### A. Breach of contract

"Under California law, an insured claiming benefits bears the burden of proving that he is entitled to coverage under the relevant policy." *Wright v. Paul Revere Life Ins. Co.*, 291 F. Supp. 2d 1104, 1111 (C.D. Cal. 2003) (citing *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998)). "Once the insured has met that burden, the insurer bears the burden of proving that a claim is within an exclusion to the contract." *Id.* "Thus, to prevail in its summary judgment motion, [the insurance company] need only show that [the insured] has provided no evidence to support his causes of action, or that [the] disability claim falls within an exclusion to the disability insurance contract." *Id*

Defendant contends that plaintiff cannot show that she is disabled under the policy, and that all of the evidence shows that plaintiff was malingering. Plaintiff responds that there are numerous issues of fact and that summary judgment is inappropriate.

The Court finds that defendant's motion presents a very close call on the breach of contract claim. The Court has reviewed the voluminous evidence in this case, including the videotaped deposition of plaintiff and plaintiff's wedding video. Although there is considerable and powerful evidence suggesting that plaintiff is malingering, the lengthy history of plaintiff's claim is complicated

---

[3] Defendant has also objected to the September 3, 2014 submission of additional deposition testimony by various witnesses, as well as a new declaration by plaintiff's treating physician, Dr. Belfor. The Court makes no finding regarding whether Dr. Belfor is an expert witness who should have been disclosed, but does agree with defendant that the declaration is untimely for purposes of the instant summary judgment motion as it was filed after briefing was complete and after the hearing.

and numerous doctors have diagnosed plaintiff with different conditions at different times. Drawing all inferences in favor of plaintiff, as the Court is required to do on summary judgment, the Court concludes that summary judgment on the breach of contract claim is not appropriate.

**B. Breach of implied covenant of good faith and fair dealing**

In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). Unreasonable in this context means "without any reasonable basis for its position." *Casey v. Metropolitan Life Ins. Co.*, 688 F. Supp. 2d, 1086, 1098 ((E.D. Cal. 2010). Accordingly, "bad faith liability does not exist for a legitimate dispute of an insurer's liability under the policy." *Id*. "A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds," and its existence can be decided as a matter of law "[p]rovided there is no dispute as to the underlying facts." *Id*. at 1098-99; *see Bosetti v. United States Life Insurance Co.*, 175 Cal. App. 4th 1208, 1237 (2009).

Plaintiff argues that defendant was unreasonable because Northwestern's experts were biased. In support of this contention, plaintiff notes that neither Dr. Swanson nor Dr. Logan contacted or met with plaintiff. Drs. Logan and Swanson are psychiatric and neuropsychological consultants who Northwestern Mutual asked to review plaintiff's psychiatric and neuropsychological records and reports. Plaintiff does not cite any authority holding that consulting doctors are required to personally contact or meet with an individual who is being assessed. Further, NML did arrange for plaintiff to be examined in person by both Drs. Paltzer and Dr. Reich, and plaintiff spent 2.75 hours meeting with Dr. Reich and almost 4 hours with Dr. Paltzer. In addition, Drs. Paltzer and Reich contacted plaintiff's treating doctors. Plaintiff's assertion that Drs. Logan and Swanson are biased is without merit.

Plaintiff also argues that Northwestern Mutual was biased because it did not consider Dr. Paltzer's finding that plaintiff appeared to meet criteria for anxiety disorder not otherwise specified. However, Dr. Paltzer agreed with Dr. McMullen's 2005 test results and opinion that plaintiff was malingering, and Dr. Paltzer did not find plaintiff to be disabled by anxiety. Dr. Paltzer also noted that "it is not possible to differentiate between pre- versus post-accident anxiety and depression due to her

tendency to exaggerate symptoms." Hyde Decl., Ex. 49 at 21.

The Court concludes that plaintiff has not established a genuine issue of material fact regarding the reasonableness of Northwestern Mutual's claim decision. The record before the Court shows that Northwestern Mutual's claim handling was comprehensive and reasonable, and that at a minimum a genuine dispute existed regarding whether plaintiff was disabled. Northwestern Mutual set up four separate IMEs of plaintiff, and while each doctor's conclusions differed slightly, they all opined that plaintiff was feigning symptoms. "The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable – for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 724 (2007); *see also Bosetti*, 175 Cal. App. 4th at 1239-1240 (granting insurer's motion for summary adjudication of bad faith claim where independent exam findings created a genuine dispute as to whether coverage existed).

**C. Intentional/fraudulent and negligent misrepresentation**

To prevail on this cause of action, plaintiff must show (1) a misrepresentation of a material fact; (2) that is false and that is known to be false at the time it is made; (3) that is made with the intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996); *see also* Cal. Civ. Code §§ 1709, 1710.

Defendant contends that plaintiff has not produced any evidence to show that defendant made any misrepresentations to plaintiff. Plaintiff's opposition does not address this claim, and thus it appears that plaintiff has abandoned this claim. In any event, the Court concludes that there is no evidence in support of a misrepresentation claim, and thus that defendant is entitled to summary judgment on this claim.

**D. Intentional infliction of emotional distress**

The elements of a *prima facie* case of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless disregard for the probability of causing, emotional distress; (2) suffering of severe or extreme emotional distress by

United States District Court
For the Northern District of California

plaintiff; and (3) plaintiff's emotional distress is actually and proximately the result of defendant's outrageous conduct. *Conley v. Roman Catholic Archbishop of San Francisco*, 85 Cal. App. 4th 1126, 1133 (2000). "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593 (1979).

Plaintiff contends that Northwestern Mutual's conduct was outrageous because it selected doctors "who did not even examine or speak" with plaintiff, and that Northwestern Mutual's denial was based on malingering without having ever "once used any approved objective test for malingering." Opp'n at 16. The record does not support these assertions, as defendant has submitted evidence showing that defendant scheduled four IMEs with plaintiff, the last two in 2011 prior to its claim denial. Further, the record shows that the doctors performed a battery of tests on plaintiffs, including tests for malingering.

Plaintiff also asserts that defendant never provided its experts with factual information that would have helped them evaluate whether plaintiff had a financial motivation to malinger. Specifically, plaintiff asserts that defendant did not inform the experts that plaintiff had been accepted into a dentistry fellowship program that would have increased her earning potential. However, as defendant notes, the doctors were aware of the fact that plaintiff had been accepted into a pediatric dentistry fellowship, and the doctors mentioned this fact in their reports. *See* Hyde Decl., Ex. 49 at 2 (Paltzer report); Hyde Decl., Ex. 51 at 2 (Reich report).

The Court concludes that plaintiff has not identified any outrageous conduct on the part of defendant, and thus that defendant is entitled to summary judgment on this claim.

**E. Punitive damages**

To recover punitive damages, plaintiff must prove by clear and convincing evidence that defendant's actions were oppressive, fraudulent or malicious. Plaintiff contends that defendant acted with malice because doctors never examined or spoke with plaintiff, the experts diagnosed plaintiff with malingering without ever performing objective testing, defendant failed to tell doctors that plaintiff was accepted into the dentistry fellowship, discontinuing benefits after paying for a period of time, and not reinstating plaintiff's benefits after this lawsuit was filed.

As discussed above, these assertions are belied by the record. Defendant considered four

**United States District Court**
For the Northern District of California

independent medical evaluations by doctors who examined plaintiff in person and spoke to her doctors. Two neuropsychologists conducted a number of tests for malingering. All of the IME doctors knew about plaintiff's fellowship. On this record, defendant's decision to terminate benefits was not unreasonable, much less oppressive, fraudulent or malicious. Further, in light of the evidence discovered after this lawsuit was filed regarding plaintiff's level of functioning in non-medical contexts and her misrepresentations to her treating physicians, no reasonable finder of fact could conclude that defendant engaged in malicious conduct by failing to reinstate plaintiff's benefits.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART defendants' motion for summary judgment and GRANTS defendant's motion to exclude the July 16, 2014 report of Dr. Williams for purposes of this motion. Docket Nos. 24 & 54.

**IT IS SO ORDERED.**

Dated: September 26, 2014

Susan Illston
SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE